M631GENC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                18 Cr. 762 (PAC)

NUNZIO GENTILLE,

             Defendant.               Arraignment and
                                            Conference
------------------------------x

                                            New York, N.Y.
                                            June 3, 2022
                                            2:15 p.m.

Before:

                  HON. DENISE COTE,

                                            District Judge

                          APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  AMANDA C. WEINGARTEN, ESQ.
     MATTHEW J. KING, ESQ.
     Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
     Attorneys for Defendant
BY:  THOMAS H. NOOTER, ESQ.

ALSO PRESENT:  NOAH JOSEPH, U.S. Probation Officer, SDNY
               KRISTEN MAHARAJ, U.S. Probation Officer, EDNY

M631GENC

1              (Case called)

2              THE DEPUTY CLERK:  Is the government ready to proceed?

3              MS. WEINGARTEN:  Yes.  Good afternoon, your Honor.

4    Amanda Weingarten for the government.  With me at counsel table

5    is AUSA Matthew King, as well as E.D.N.Y. Probation Officer

6    Kristen Maharaj and SDNY Probation Officer Noah Joseph.  Thank

7    you.

8              THE DEPUTY CLERK:  For the defendant?

9              MR. NOOTER:  Good afternoon, your Honor.  I am Thomas

10   Nooter.  I'm CJA for the day.  I'm here because I understand

11   Mr. Gentille, who is here, may need appointment of CJA counsel.

12   I have not had more than about a minute to speak with him.

13   Frankly, it doesn't sound to me as if he qualifies for CJA

14   counsel.  But we don't have a financial affidavit or anything.

15   So I don't know how the Court wants to proceed with that.  He

16   tells me he does have his own attorney who would be available

17   next week but is upstate today.  So I'm at the Court's

18   disposal, but I don't know if we need to obtain a little more

19   information before I'm actually appointed.

20             THE COURT:  Thank you very much, Mr. Nooter.  That's

21   very helpful.

22             And do you have a copy of an appointment affidavit,

23   Mr. Nooter, to review whether or not, in filling out the

24   financial form, the defendant would qualify, or is it just

25   based on your conversation with him?

M631GENC

| 1 | MR. NOOTER:  Just based on the conversation.  I have

2 | not seen a CJA 23 form.

3 | THE COURT:  Okay.  Thanks.  Why don't you be seated

4 | for a moment.

5 | This is a case in which the defendant was sentenced by

6 | Judge Nathan, and the case has since been reassigned to me.  I

7 | have the report of May 27th from the probation department

8 | indicating that there are grounds—and six are listed—for

9 | violation of the terms of supervised release.

10 | Let me ask you, Officer Maharaj, has the defendant

11 | been provided with a copy of the six specifications?

12 | MS. MAHARAJ:  No, your Honor.

13 | THE COURT:  Do you have a copy for him?

14 | MS. WEINGARTEN:  I have a spare copy, your Honor.

15 | THE COURT:  Thank you.  The government,

16 | Ms. Weingarten, is providing a copy for the defendant.

17 | Keep your mask on, Mr. Gentille.

18 | And I should advise counsel that should you wish to

19 | address the Court without your mask, you may do so, but only

20 | from the podium.

21 | So I'm happy to put this matter over to next Friday to

22 | let the defendant appear with retained counsel, counsel of his

23 | own choosing.  That's just fine.  Alternatively, if the

24 | defendant believes that he qualifies for appointment of

25 | counsel, Mr. Nooter can go over the financial affidavit with

M631GENC

1    him this afternoon, and if he qualifies, I'm happy to appoint

2    Mr. Nooter to represent the defendant.

3           But let's take advantage of this time together to

4    accomplish a few things and get this case organized.  But

5    again, Mr. Gentille, I'm happy to continue with this matter

6    next week when you have counsel of your own choosing beside

7    you, and able to consult with you.

8           You haven't been given a copy, Mr. Gentille, of the

9    specifications of supervised release violations before this

10   moment, so I'm just going to ask you to read them slowly to

11   yourself.  We're going to take a minute here so you can do

12   that.  And tell me when you're finished reading them.

13           THE DEFENDANT:  Yes, ma'am.

14           (Pause)

15           THE COURT:  I'm going to interrupt your reading,

16   Mr. Gentille, to tell you that I'm just going to enter a denial

17   on your behalf today.  Right now I don't need you to respond

18   whether you admit or deny.  I just need to make sure you have a

19   chance to read that.  So let me continue giving you that

20   chance.

21           THE DEFENDANT:  Yes, ma'am.

22           (Pause)

23           MS. WEINGARTEN:  Your Honor, if I may.  I just wanted

24   to --

25           THE COURT:  Excuse me.  I want to make sure the

M631GENC

1    defendant can hear anything you say.

2              (Mr. Nooter conferring with the defendant)

3              THE COURT:  So Mr. Gentille, have you finished reading

4    through the six specifications?

5              THE DEFENDANT:  Yes, ma'am.

6              THE COURT:  Okay.  Thank you.  The government wanted

7    to say something before I allocute you.

8              MS. WEINGARTEN:  Thank you, your Honor.

9              I just wanted to let the Court know that it was the

10   government's intention to seek remand today, and that may

11   affect the calculus for the defendant in terms of counsel, but

12   I wanted to give the defendant the opportunity to consider that

13   in this time.

14             THE COURT:  Thank you.

15             MS. WEINGARTEN:  Thank you.

16             THE COURT:  So let me just ask you to stand,

17   Mr. Gentille.

18             Have you had an opportunity to read the six

19   specifications?

20             THE DEFENDANT:  Yes, ma'am.

21             THE COURT:  Do you wish me to read them to you?

22             THE DEFENDANT:  No, ma'am.

23             THE COURT:  I'm going to enter a denial on your behalf

24   at this time.  You may be seated.

25             THE DEFENDANT:  Yes, ma'am.

M631GENC

| 1 | THE COURT:  So Ms. Maharaj, could you review with me |

1          THE COURT:  So Ms. Maharaj, could you review with me

2     the drug testing history in recent months for the defendant.

3          MS. MAHARAJ:  Yes, your Honor.  In the --

4          THE COURT:  Please stand.

5          MS. MAHARAJ:  In the recent months, Mr. Gentille has

6     not been tested.  He was previously in drug treatment and had

7     successfully completed that in 2021.  There is no reason to

8     believe that he has had any illicit substance use.

9          THE COURT:  So when was the last time he was tested?

10         MS. MAHARAJ:  I don't have that in front of me, your

11    Honor.

12         THE COURT:  You don't normally test people on

13    supervision?

14         MS. MAHARAJ:  We randomly do test people, especially

15    if they are in drug treatment.  If we have reason to believe

16    that they're using illicit substances, we would test them.  We

17    didn't have any reason to believe that he was.

18         THE COURT:  Okay.  I'm a little surprised.  This

19    defendant is, or was at the time of his sentence, criminal

20    history category V, drug conviction, had been in drug

21    treatment.  I'm a little surprised there isn't a random drug

22    testing protocol that follows automatically whatever schedule

23    that may be on.  But that's a separate issue.

24         I have a report of May 27th from the probation

25    department to support the specifications that have been filed.

M631GENC

```
1    Is there anything additional that you wanted to bring to my
2    attention, Ms. Maharaj?
3              MS. MAHARAJ:  There's nothing additional, your Honor.
4              MS. WEINGARTEN:  Your Honor, if I may.
5              THE COURT:  I'll hear from the government.  Yes,
6    Ms. Weingarten.
7              MS. WEINGARTEN:  Thank you, your Honor.
8              In addition to the specifications that you have in the
9    violation report, your Honor, there has also been a statement
10   by a witness to an officer that there is a firearm, that this
11   witness saw a firearm in the apartment of the defendant's.  For
12   safety reasons, I would like to respectfully refrain from
13   listing that witness's name.  But I thought that would be
14   important for the Court to know, given that during that time
15   period, other witnesses came forward stating that the defendant
16   had threatened to shoot up the Secure Self Storage
17   establishment and to cause other types of harm to various
18   witnesses.  So the government believes that that's an important
19   factor, your Honor, that should be brought to the Court's
20   attention.
21             THE COURT:  So do you have an application,
22   Ms. Weingarten?
23             MS. WEINGARTEN:  Yes, your Honor.  For remand.  May I
24   continue with that?
25             THE COURT:  Yes.
```

M631GENC

1          MS. WEINGARTEN:  So, your Honor, the government views

2     Mr. Gentille's recent arrests as truly disturbing and that they

3     demonstrate an escalating pattern of harassment against women,

4     and including a woman with whom he was romantically involved,

5     and we believe that --

6          THE COURT:  Excuse me one second.

7          MS. WEINGARTEN:  And the government believes that

8     Mr. Gentille has demonstrated that he is a danger to his

9     community.  There were at least four complainants related to

10    these two arrests from March and April of 2022 that form the

11    basis of the specifications.  Each of these complainants claim

12    that Mr. Gentille threatened them and made other menacing

13    statements.  Some of those threats included a statement, "I'm

14    going to blow your face off and shoot up the place," another

15    statement, "I'm going to burn this place down and fuck you up,"

16    another statement, "I will catch you on the street," and the

17    manager at this Self Secure company said that Mr. Gentille

18    actually did show up to the establishment, causing that manager

19    to fear for her life.

20         About a month later, the defendant got into a series

21    of verbal disputes with a romantic partner.  He extorted her by

22    saying that he would expose nude photographs of her to family

23    and friends if she didn't make weekly payments to him.  He

24    said, "Just Google me.  You'll see the violent crimes that I

25    have done in the past and you'll see what I'm capable of."  He

M631GENC

1    also stole her phone, her car keys, and he pounded so hard on

2    her window that it caused -- causing it to crack.  He said,

3    "I'm going to hurt you.  Don't leave your home."

4              The government also notes that Mr. Gentille has a

5    youthful offender conviction for misdemeanor assault, there was

6    a prior protective order filed against him in 2012, and that

7    there is another conviction for attempted petit larceny where

8    he actually broke into a car, among other convictions.

9              So, your Honor, with regard to risk of flight, the

10   probation officer has made several attempts to visit with

11   Mr. Gentille at the address in Brooklyn that he provided, but

12   it seems that there's uncertainty as to whether he actually

13   lives in the address that he provided to the probation officer.

14   Mr. Gentille has told probation that he is now living in a

15   hotel and is seeking to move to another location, but has not

16   provided the probation officer with that address or the phone

17   number of his romantic partner in order to contact him.

18   However, we feel that it is the danger to the community that is

19   the strongest and most compelling factor for remand.  Thank

20   you, your Honor.

21             THE COURT:  So Mr. Nooter, I understand you're

22   uncertain about your status with respect to representing the

23   defendant.  I'm going to appoint you because of the application

24   that's just been made to me now, and again, if the defendant

25   has the funds to retain counsel or has counsel, other counsel

M631GENC

1    to represent him, I'm happy to have another conference next

2    week for that counsel to appear and be heard.  But in the

3    meantime, I don't want the defendant to be without counsel, so

4    I'm appointing you today.

5              MR. NOOTER:  Sure.

6              THE COURT:  Would you like an opportunity to discuss

7    these issues with your client, Mr. Nooter, before you respond

8    to the government's application?

9              MR. NOOTER:  I would, your Honor.

10             THE COURT:  Great.  Just let me deputy know when

11   you're ready to resume.  I'm going to ask you to stay in the

12   courtroom with your client.

13             MR. NOOTER:  Yes.

14             THE COURT:  Thank you.

15             MR. NOOTER:  Thank you.

16             THE DEPUTY CLERK:  All rise.

17             (Recess)

18             (In open court)

19             THE COURT:  Please be seated.

20             Mr. Nooter, did you have a chance to consult with your

21   client?

22             MR. NOOTER:  Yes, I did, your Honor.

23             THE COURT:  Thank you.  And so you've heard the

24   government seeks a remand.  Do you wish to be heard on that

25   issue?

M631GENC

1          MR. NOOTER:  I do.

2          THE COURT:  Thank you.

3          MR. NOOTER:  Your Honor, first of all, I will also say

4     I did speak to the lawyer that my client told me about.

5     Although I didn't know him personally, it turns out I do know

6     his partners, one of whom is Jeremy Schneider, who I think you

7     may know.

8          THE COURT:  Yes.

9          MR. NOOTER:  He's been representing him in the state

10    court cases, which arise out of these complaints, the

11    complaints that are the specifications, the ones that resulted

12    in arrest, the pending state court cases.  There are two of

13    them.

14          THE COURT:  Can he get here this afternoon?

15          MR. NOOTER:  No.  I didn't actually go over that with

16    him.  But I understand he's not in the city.

17          One of those has been adjourned till June 16th in

18    Queens criminal court, and the other one has been adjourned to

19    mid-July.  He didn't remember the exact date.  In both cases,

20    they've been -- I don't know if your Honor knows or remembers

21    anything about state court, but there's a thing that's called

22    marking a case final against the People.  It's final against

23    the People in both cases, meaning the case will be dismissed

24    the next time unless they obtain a corroborating affidavit.

25    The complaint is a hearsay complaint, and in order to go

M631GENC

1    forward, to turn it into an information, they need a

2    corroborating affidavit, and the People have not been able to

3    obtain that so far.  Now they may, of course, before those

4    dates.

5          Both he and my client -- of course the lawyer's

6    information comes from my client, basically, but -- confirm,

7    state that there are a number of things about these disputes

8    that are very different from the way it appears in the charges.

9    My client is the owner of an automobile detailing and car

10   washing business, which is why I thought he may not actually

11   qualify for CJA counsel, but he's the owner of that business.

12   And he's always there during working hours.  So even though

13   he's been a little bit itinerant—and I'll explain why in a

14   minute—in terms of where he's living, he's always at his

15   business, and that's where the probation officer apparently has

16   always been able to find him if they couldn't find him for any

17   other reason.

18         But the reason he's been a little itinerant is that he

19   has been living and still considers his residence 244 Nassau

20   Avenue in Greenpoint, Brooklyn, with his girlfriend Jennifer,

21   who is not one of the complainants that has been discussed.

22   But Jennifer's mother just passed away, and apparently Jennifer

23   is very upset, and that has led to my client sometimes staying

24   in a hotel, not moving permanently to some hotel but sometimes

25   he doesn't stay nights there so he'll stay in a hotel, which is

M631GENC

1    what he did tell his probation officer.  But the business is an

2    anchor, obviously; it's a place to find him.  He's not going to

3    run away from his business, give up that asset, in effect, in

4    order to avoid coming back to court, which is all this really

5    should be about, is he going to come back to court.

6            He's confident -- he's told me more about what these

7    disputes are about.  One had to do with a storage facility

8    where he had some things stored.  He got into a dispute with

9    the owner of that, when his dog apparently urinated in the

10   storage facility, and so there was a fight over that a little

11   bit.  And then the other three complainants, as -- as far as I

12   can identify, are people who were hired to work for him at the

13   car wash, who then he felt were stealing and so he fired them.

14   So that's resulted in the dispute that has resulted in these

15   various claims.  He denies some of the individual facts, like

16   that any window of a car was broken.  I mean, all of these

17   things we can't really litigate right here, but he does -- he

18   presents to me reasonable denials of what some of these charges

19   are, which, coupled with the fact that the complainants have

20   not come in to the prosecutor's office to sign the

21   corroborating affidavit and having the criminal charges, which

22   are all misdemeanors, dismissed on the next court date, make me

23   believe that there's certainly two sides to this story.  The

24   other lawyer mentioned that he had been offered a plea to a

25   violation, which is not a crime, with an idea that he would

M631GENC

1    have an anger management program or something, and they turned

2    that down.  But it could be that somewhere in Mr. Gentille's

3    future, some kind of anger management might be appropriate.

4          But on a lot of the specifics that these complaints

5    refer to, he either denies that they're correct or he has a

6    different explanation for what they are, which is not

7    consistent with being guilty of the criminal charges.

8          Finally, I've never seen anything from the government

9    that suggests he hasn't shown up in court when he was supposed

10   to.  He was a little late today, but as this Court may know,

11   there's a protest going on outside in front, and he had come by

12   car with a friend and he had some trouble getting up to the

13   courtroom right on time, but he was only 15 minutes late.

14         I would also say that, well, he's very, very concerned

15   about how the business is going to continue to run and who's

16   going to take care of his dog and things like that if he ends

17   up being remanded today.  And I would just say that in terms of

18   the only thing that really is important here, which is whether

19   he's going to come back to court, that there's almost -- it's

20   almost a certainty, you know, unless he's going to throw away

21   this whole business that he's built up over years that he is

22   the owner of.

23         THE COURT:  So Mr. Nooter, I'm not really focusing on

24   the failure to appear, I'm focusing on the danger issue, that

25   there's a report that he has a firearm or that specifically I

M631GENC

1  think a firearm was seen in his residence.  And --

2          MR. NOOTER:  Why wouldn't he have been charged with

3  it?  Why wouldn't the police have come and exercised a search

4  warrant?  I mean, there are -- he's obviously got some disputes

5  going on with these ladies, and they may be heated, but they

6  also seem to have resulted in exaggerated set of feelings.  He

7  doesn't have any kind of -- well, I can't say whether there's

8  an order of protection in the state case.  There might have

9  been one issued.  But if there were such a thing, one would

10  think that that would have been followed up on immediately by

11  law enforcement.  It just seems that it's likely that it's one

12  of these things that people are trying to make things difficult

13  for each other because they're mad at each other and that if

14  there -- since I expect a short adjournment, I mean, I would

15  perhaps suggest shorter than next Friday, but a short

16  adjournment to see if we can get the thing actually totally

17  resolved --

18          THE COURT:  So Mr. Nooter, this case may go forward

19  whether or not the state charges are dismissed.

20          MR. NOOTER:  Of course.  We've had that experience

21  together.

22          THE COURT:  Yes.  Yes.  The government may pursue

23  violations of supervised release even if state charges are

24  dismissed.

25          MR. NOOTER:  Right.  But it seems --

M631GENC

1          THE COURT:  So we have a situation here where there

2    are independent claims—that is, people who don't know each

3    other—each describing threatening behavior by the defendant—out

4    of control, threatening, frightening behavior.  We have a

5    report here of a witness seeing a gun, which the defendant has

6    access to.  I have a probation department that has not been

7    able to confirm residence, either the apartment he stayed in --

8    they've never been given access to that, they have no way of

9    contacting the woman who he asserts he's living with, I guess

10   Jennifer.  They have no phone number for her that works.

11   They're not given access to the apartment.  They don't know

12   where this hotel room is.

13          So the only thing probation knows is that last year he

14   finished a drug treatment program successfully; and two, he has

15   a car wash business—which is good, that's terrific—that they

16   have seen.  They're not able to confirm residence.  And I have

17   these disparate, independent reports of threats.

18          MR. NOOTER:  Your Honor, I haven't quite heard that

19   they weren't able to confirm residence in the past.  That may

20   have been -- you may be correct.  It's not what I had heard

21   from the --

22          THE COURT:  Well, let me make sure I understood

23   correctly from the probation department, whom I've just met.

24   Ms. Maharaj, have you been able to enter the defendant's

25   residence at any point and confirm that's where he lives?

M631GENC

```
 1              MS. MAHARAJ:  No, your Honor.  Prior to the past
 2     month, Mr. Gentille was under our low-risk offenders so we
 3     weren't required to conduct a home visit.  I did attempt a home
 4     visit a few weeks ago, and I was not able to confirm that he
 5     resides there, as well as I did ask to speak with his
 6     girlfriend who does reside at that address in Brooklyn, and
 7     Mr. Gentille has not been able to give me her phone number and
 8     stated that she was having issues with law enforcement coming
 9     to her home.  So the probation department has not confirmed
10     that Mr. Gentille resides in Brooklyn.  He did inform me
11     yesterday that he's been staying at a hotel in Queens, which he
12     did provide me the address of.  I did not get the room number
13     for him.  But he stated that he would be leaving there and
14     securing an apartment, I believe he said today, on Queens
15     Boulevard.
16              THE COURT:  Thank you.
17              MS. MAHARAJ:  You're welcome.
18              THE COURT:  Mr. Nooter, just to bring you up to speed
19     there on the residence issues.
20              MR. NOOTER:  Right.  So I do think's a little bit
21     different than the way the Court had summarized it.
22              THE COURT:  In what way?  I'm sorry.  I didn't mean to
23     mislead you.
24              MR. NOOTER:  Only insofar as I assumed that the
25     probation officer did speak to his girlfriend.  Am I correct or
```

M631GENC

1    am I not?

2              THE COURT:  No.  She did not.

3              MR. NOOTER:  But did find the residence of the

4    girlfriend.

5              THE COURT:  Was not permitted to enter, has not spoken

6    with the girlfriend, and has not inspected the residence.

7              MR. NOOTER:  All right.  But one final point my client

8    made, by the way, is that he self-surrendered when he was

9    informed that they wanted him to, you know, that they had --

10   that they wanted to arrest him on these misdemeanors charges.

11   But I suggest that, again, the risk of losing the business,

12   which is a place where he can be found, is something that would

13   be such a motivating factor, that that, along with the Court's

14   admonitions, would keep him from doing anything in the interim

15   that would be harmful to any other person.  And in addition,

16   the fact that these cases have been pending since I believe it

17   was April without any suggestion that there was any harm to

18   anybody since, in that interim period, and certainly without

19   any suggestion that he failed to appear, that he can be relied

20   on to come back to court in order to dispute these charges,

21   which he very vehemently disputes.

22             THE COURT:  So again, I'm not relying on the failure

23   to appear.  I'm relying on the danger to the community, from

24   access to a firearm, and from threats as described in the

25   probation department report, to independent people who don't

M631GENC

1    know each other.

2              MR. NOOTER:  I mean, the access to firearms is awfully

3    vague.

4              THE COURT:  Well, it's not a vague assertion of a

5    firearm being seen in an apartment in which he lives.

6              Let me make sure I got that right, Ms. Weingarten.

7              MS. WEINGARTEN:  Yes, that's the government's

8    understanding, your Honor, is that a witness observed the

9    firearm in the apartment in which the defendant resides.

10             MR. NOOTER:  And again, you know, I would just repeat

11   that if that were the case, why didn't the witness tell the

12   police or tell the prosecutors, assuming the witness is one of

13   the complainants who already is a complainant in the cases that

14   are pending in Queens criminal court, so that something could

15   be done about it?  It just seems a very vague basis at this

16   point for holding him in jail.

17             THE COURT:  Thank you, Mr. Nooter.

18             Ms. Weingarten, you wanted to respond?

19             MS. WEINGARTEN:  Yes, your Honor.  And just to be

20   clear, to clarify the record, and as I mentioned earlier, I'm

21   not at liberty to disclose who the witness was, but that

22   witness did make that statement to a law enforcement officer.

23             Your Honor, just to clarify also, the next court date

24   below is on July 15th, for the benefit of Mr. Nooter.  He

25   didn't have that date.  I spoke with the ADA on those two

M631GENC

1    cases.  Again, the next two dates are June 16th and July 15th.

2    The ADA had told me that she did make an offer that was

3    rejected, and she intends to pursue those cases in state court.

4    So, you know, those cases are continuing.

5            Your Honor, just to clarify what the defense attorney

6    described as disputes with these ladies, these are multiple --

7    there are at least four individuals that we know of who have

8    made these complaints, two of which were female, at least,

9    others were employees of the self-storage facility.  In

10   addition to making threats to blow the place up, burn the place

11   down, he also made individual threats to -- I'll use the word

12   "mess up" certain individuals and to go out and catch them on

13   the street, don't leave your home, I'll find you, you know, and

14   that coupled with access to firearms, the government believes

15   that the defendant has demonstrated to be a danger to the

16   community.

17           This is not the first time that there's been behavior

18   like this.  As I mentioned, there were previous violations to

19   property and assault charges, in addition to a protective

20   order.

21           So unless the Court has any additional questions, that

22   will be all.  Thank you.

23           MR. NOOTER:  If I could have a moment, your Honor.  My

24   client wants to tell me something, which he's writing.

25           (Pause)

M631GENC

1          MR. NOOTER:  I think the point my client wanted to

2   make to me, one of them was that at least one of these

3   complainants lives just down the street from him, and from the

4   time when they had whatever dispute that resulted in the

5   complaint being filed and the arrest being made in early April,

6   he has not had any contact with her or done anything in any

7   kind of threatening manner.  Other than that, I think I would

8   rest my argument.

9          THE COURT:  Thank you.

10         So let me see if I have the sequence of events right.

11         To make sure I do, Officer Maharaj, in Specification

12  No. 1, you indicate that on March 15th, you received

13  notification that the defendant had been arrested on

14  March 14th.  How did you receive that notification?

15         MS. MAHARAJ:  Sorry.  Can you say that again, your

16  Honor.

17         THE COURT:  Looking at Specification No. 1 --

18         MR. METZLER:  Yes.

19         THE COURT:  -- you write that on March 15th, you

20  received notification that the defendant had been arrested on

21  March 14th.

22         MS. MAHARAJ:  That's correct, your Honor.

23         THE COURT:  How did you get that notification?

24         MS. MAHARAJ:  We receive arrest notifications through

25  our administrative assistants that get reports from a database

M631GENC

1    stating that our defendants have been arrested.

2              THE COURT:  So the defendant didn't tell you.

3              MS. MAHARAJ:  For that one, he did report the arrest

4    after he was arraigned in court and released.

5              THE COURT:  So he initiated a report to you within 72

6    hours?

7              MS. MAHARAJ:  Yes, that's correct.

8              THE COURT:  Okay.  So then he was arrested on

9    March 14th and advised you within 72 hours of that arrest, and

10   that arrest had to do with the complaint made by a person who

11   manages the Secure Self Storage.

12             MS. MAHARAJ:  Yes, your Honor.

13             THE COURT:  And then there were incidents on April 3rd

14   and April 9th with respect to another woman, and an arrest

15   report was issued on April 4th.  I'm not quite sure when the

16   defendant was arrested with respect to the second set of

17   charges.

18             MS. MAHARAJ:  Mr. Gentille was arrested on April 12th.

19             MR. NOOTER:  I'm sorry, your Honor.  That was one of

20   the self-surrenders.  He had been notified to come in, and they

21   gave him a week or something to do so.

22             THE COURT:  So he was arrested on April 12th, and he

23   did not notify the probation officer within 72 hours of that

24   arrest, but the probation officer learned of the arrest and

25   contacted the defendant on April 20th.  Do I read that right,

M631GENC

1    Ms. Maharaj?

2              MS. MAHARAJ:  Yes, that's correct, your Honor.

3              THE COURT:  So I have a situation here of multiple

4    incidents that are unrelated to each other in a short period of

5    time, each of them resulting in an arrest, the second one where

6    the defendant does not alert the probation department to the

7    arrest; the probation department is unable to get access to the

8    residence or what it's been told is the residence or contact

9    information for the woman who owns or leases that apartment.

10   So I have a story here of a probation office that is unable to

11   adequately supervise and inform itself of what is happening

12   with respect to the defendant; I have a defendant who is

13   placing women in separate instances so in fear of what may

14   happen to them that they go to the police and report it.  So I

15   am going to remand the defendant.  And I'll put this matter

16   over till next week so either you, Mr. Nooter, after you have a

17   chance to further explore these issues, or his other counsel

18   can be heard.

19             THE DEPUTY CLERK:  Friday, June 10th, at 3 p.m.

20             MS. WEINGARTEN:  That works for the government.

21             MR. NOOTER:  I'm sorry.  If I can just check my

22   calendar.

23             (Defendant conferring with Mr. Nooter)

24             MR. NOOTER:  Yes, I'm available then if his other

25   counsel doesn't appear.

M631GENC

1          THE COURT:  Thank you, Mr. Nooter.

2          Thank you, all.

3          THE DEPUTY CLERK:  All rise.

4                              o0o