

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 23, 2022

**BY ECF**
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:      *United States v. Nunzio Gentille*, 14 Cr. 608 (DLC)

Dear Judge Cote:

      The Government submits this letter in advance of defendant Nunzio Gentille's sentencing for violations of the conditions of his supervised release, which is scheduled for September 28, 2022 at 11:00 a.m. For the reasons set forth below, the Government respectfully submits that a sentence at the top of the Guidelines is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing applicable here, including the need for the sentence imposed to protect the public from further aggravated harassment by the defendant and to afford adequate deterrence to criminal conduct.

    **I.**    **Background**

        **A. The Underlying Offense and Sentence**

      On April 9, 2015, Gentille pleaded guilty, pursuant to a plea agreement, before the Honorable Alison J. Nathan, who at the time was a United States District Judge, to conspiracy to distribute and possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841(b)(1)(C), (b)(1)(D) & 846. (Minute Entry, dated April 9, 2015). Gentille held a leadership role in the drug-trafficking organization, including handling orders placed via telephones and directing drivers to make deliveries to customers. (PSR at 27). On May 5, 2016, Judge Nathan sentenced Gentille to 60 months' imprisonment to be followed by five years' supervised release. (ECF No. 150). This conviction was the then-29-year-old defendant's fourth felony conviction. (PSR at 28).

      Gentille began his five-year term of supervision on April 9, 2020 in the Eastern District of New York. (*See* Violation of Supervised Release Report, dated May 27, 2022 ("Violation Report") at 2). On May 27, 2022, the United States Probation Office for the Southern District of New York filed a report identifying various violations of Gentille's supervised release, including

specifications regarding Gentille's aggravated harassment of two women in March and April of 2022. The case was reassigned to this Court on May 27, 2022 and, on June 3, 2022, the parties appeared before the Court on a summons. Upon the Government's application, the Court remanded the defendant on June 3, 2022. On August 23, 2022—two days before an evidentiary hearing was scheduled to take place—the defendant pleaded guilty to all six specifications. (Minute Entry, dated August 23, 2022).

### B.  The Offense Conduct

Below is a summary of the facts relating to each of the six specifications to which the defendant pleaded guilty.

#### i.  Specification 1: The March 2022 Secure Self-Storage Incidents

As the defendant admitted on August 23, 2022, he violated the terms of his supervised release by committing aggravated harassment in the second degree, in violation of New York Penal Law "NYPL" § 240.30, by communicating a threat by electronic means. (Violation Report at 2, Specification 1). The specification arises from an incident in March 2022 in which Gentille threatened the employees of a Secure Self-Storage facility located at 75-28 Queens Boulevard, Queens, NY 11373 ("SSS").

Through interviews with two employees of SSS, the Government has learned the following:

On March 7, 2022, Gentille arrived at SSS and proceeded to his storge unit on the second floor with his dog, whom he knew was sick. While at SSS, Gentille's dog defecated and urinated in the hallway on the second floor outside his storage unit and, rather than clean it up or notify a SSS employee, Gentille and his dog left SSS. About a half hour later, an employee, Employee-1, discovered the mess. Employee-1 informed his boss, Employee-2, who told Employee-1 to send Gentille a text message informing him that, per SSS policy, Gentille would be charged a $25.00 cleaning fee if Gentille did not return to clean up the mess. Because Gentille did not respond, Employee-1 cleaned up the mess and Gentille was charged $25.00.

Several hours later, Gentille began to call SSS incessantly and spoke with Employee-1 in an aggressive manner. Gentille told Employee-1, in sum and substance: (1) "I know who you are, you're the fat guy that sits in the front," and (2) "If I go down there and smack the shit out of you, will you take the $25 off [my account]?" When Gentille continued to escalate his aggression, Employee-1 hung up the phone abruptly.

When Gentille called back the next time, Employee-2 answered the phone and spoke with Gentille, who was aggressive and irate. Gentille told her, in sum and substance: "I'm going to come and blow your head off." At that point, Employee-2 called 911. Approximately ten minutes after Gentille communicated the threat to Employee-2 over the phone, he arrived at the SSS in person. While at SSS, Gentille said to Employee-2, in sum and substance: (1) "I'm going to burn the building down," and (2) "I'm going to shoot up the place." He further made racist and derogatory remarks by, among other things, calling Employee-2 a "monkey" and making fun of

2

her lips. During this encounter, Employee-1 and several customers were present, so Employee-2 signaled for them to leave so that they would not be harmed.

Also during this encounter, Employee-2 called the Property Manager of SSS, Employee-3, via FaceTime. Employee-3 was the employee who opened Gentille's account earlier that year, and Employee-2 hoped that Employee-3 would be able to assist. Employee-2 held her phone out so that Employee-3 and Gentille could see one another via FaceTime, but Gentille "went haywire and started threatening [Employee-3]." Gentille threatened Employee-3 by stating, in sum and substance, "let's bring this into the streets" and "you know what time it is; I'll see you in the street." Eventually, Gentille left the premises.

Employee-2 reported to the Government that, as a result of Gentille's threats, she feared for her life. As Employee-2 put it, "I believed [that Gentille would] do what he said he'd do," namely, "shoot up the place." Employee-2 subsequently altered her route to work to avoid passing by the car wash at which Gentille worked, which is located approximately one block from SSS. As recently as August 2022, Employee-2 continued to take an alternate route to SSS for fear of seeing the defendant.

### ii. Specifications 2-5: The April 2022 Offenses Against the Defendant's Ex-Girlfriend

As the defendant admitted on August 23, 2022, he violated the terms of his supervised release by committing (1) petit larceny, in violation of NYPL § 155.25, by stealing property; (2) unauthorized use of a vehicle in the third degree, in violation of NYPL § 165.05, by using a vehicle without the consent of the owner; (3) criminal mischief in the fourth degree, in violation of NYPL § 145.00, by intentionally damaging the property of another; and (4) aggravated harassment in the second degree, in violation of NYPL § 240.30, by communicating a threat by electronic means. (Violation Report at 2-3, Specifications 2-5). These specifications arise from several incidents in April 2022 in which Gentille threatened and harassed his ex-girlfriend, Witness-1.

Witness-1 is 21 years old. In March and April of 2022, she lived approximately one block from Gentille's car wash and briefly engaged in a romantic relationship with Gentille. Through several interviews with Witness-1, the Government has learned the following:

On or around April 3, 2022, Witness-1 arrived home from a trip out of state. As she exited a car while carrying several bags and suitcases, she saw Gentille standing outside her apartment building. Witness-1 and Gentille had a romantic relationship for a short time, but by April 3, Witness-1 had ended the relationship because Gentille had become controlling and jealous. By way of example, Gentille had watched Witness-1's apartment and followed her when she left the apartment. He would ask her, in sum and substance: "Where are you going?"; "Who were you with?"; and "Why are you dressed like that?" Eventually, Gentille started telling Witness-1 that she could not leave her apartment without him.

When Witness-1 saw Gentille standing in front of her apartment on April 3, she told him to leave and that she did not want to have anything to do with him. Witness-1 tried to run from the car to her apartment door, but Gentille physically restrained her so that she could not reach the

door. When she finally made it to her door, Gentille pushed her inside of her apartment and entered her home without her permission. Gentille started accusing Witness-1 of having sex with other men and told her, "You belong to me." Witness-1 told him to leave, but Gentille kept screaming at her. Eventually, Gentille stole Witness-1's cellphone out of her hand and left her apartment.

Hours later, Gentille called Witness-1's roommate and spoke to Witness-1 through her roommate's phone. Gentille told Witness-1 that he broke into her cellphone and had access to private, nude photographs and videos of Witness-1 that he found on Witness-1's cellphone. Gentille threatened Witness-1 that he would send those private photographs and videos to her friends and family unless she made weekly payments to him in amounts ranging from $300 to $3,000. Gentille made these threats during multiple phone calls with Witness-1, many of which she recorded and produced to the Government.[1] (*See, e.g.*, GX A-D).[2] Gentille also texted similar

---

[1] Pursuant to the Court's Order dated September 21, 2022 (Dkt. No. 240), Government Exhibits A-I have been submitted directly to the Clerk of Court and Chambers. Government Exhibits A-D and F-G may be publicly filed. Government Exhibits E and H-I contain personal identifying information and are therefore submitted under seal.

[2] GX A: "Whatever you do for your money . . . I want half of it, half. If not, everybody in your family in this phone book will know about your pictures, what you do for a living, what you do to make your money, how sexual you are, how [much of] a slut you are . . . everybody will know. . . . I'm reading it, I'm watching it. . . . If not, everybody in your phone book knows about you. . . . Alright so I'll tell everybody in your phone book, starting with your mother. From your mother down to your little brother. Your little brother is gonna see naked pictures of you and everything. I'm not fucking around. You fucked up with me. You fucked up bad. Do you want me to start with your little bother? . . . Send pictures of your toto [vagina]? Si, okay, I'll start with that one. . . . I'm gonna make money off you. You stupid? Or everything in your phone goes to everybody in your phone book. . . ."

GX B: "I'm putting all your shit on YouTube. . . . Your videos, everything . . . your sex videos, everything . . . your toto [vagina] . . . I get money in this situation, you get no money…."

GX C: "I'm not fucking with you no more or everybody in your phone book gonna know what you do. . . . You thought you were gonna get rid of me like that. . . . I'll fucking go in your house when I want, how I want, when I want. . . . You deserve everything that's gonna happen to you."

GX D: "You play stupid, I try to talk to you, you kick me out of the house. . . . You just don't want me in the house because you want to talk to other guys on the phone all fucking night. Your phone, you shut the phone off, I don't care about shutting the phone off. . . . Oh, who's this? Text message. I'll read them right now. Oh, it's hidden in the cloud, oh it's hidden. I thought you didn't have hidden ones. But you do. Oh, you want me to try to sign out? I'm not doing that. I'm not trying to sign out. You tried to sign me out. You're trying to get me out of your phone. It will never happen. . . . Oh, what do you got here? Damn, you got so much shit in your phone. Let's look at your Telegrams. Mucho, mucho!"

versions of these threats to Witness-1's roommate.  The below photograph depicts a screenshot that Witness-1 took of her roommate's cellphone during a conversation with Gentille.  Gentille's portion of the conversation is in black and white text.



(GX E).

Later that evening, at approximately midnight, Gentille arrived at Witness-1's apartment driving Witness-1's car.  Gentille honked the horn incessantly and accelerated the car loudly which frightened Witness-1.  Gentille did not have permission to drive Witness-1's car.  While Witness-1 was on her out-of-state trip, her roommate took Witness-1's car to Gentille's car wash.  Although Witness-1 asked Gentille for her car back, Gentille refused to return it for several days, stating that he would accept her car as payment in exchange for not exposing her private photographs and videos to her family and friends.  Gentille kept Witness-1's car without her permission until

Witness-1's mother finally went to the car wash and demanded that Gentille return her daughter's car. When Witness-1 got her car back, it was extensively damaged—including broken windows.

Days later, Gentille again arrived at Witness-1's apartment and engaged in behavior that caused Witness-1 to fear for her life. Gentille tried to break into her apartment through the bars on the door, waving his arms around through the bar windows, as depicted in the screenshot of a video below. (*See* GX F). Gentille said, "I'll break the window next," (*id.*), and threatened to bring "four or five" of his friends with him to Witness-1's apartment to hurt her, stating, in sum and substance, "we don't care about police. No police, we don't give a fuck. 'Cuz they'll do it, and I'll stand still. They'll go to jail, [and] I'll pay for them to come out." (GX G).



(GX F).

Both Witness-1 and her roommate called 911 several times on account of Gentille's threats and behavior. During one of these 911 calls, the listener can hear Gentille shouting in the background as follows, in sum and substance:

> Shut up, bitch! Shut the fuck up! . . . You and his girlfriend are fucking sluts! . . . It's over. I'm letting everybody know. . . . . [Witness-1], you're good, Mami. I promise you it's going to cost you fucking money and a lot of trouble after today.

6

> Today you got yourself into trouble. I am going to show everybody. You need to bring me my money, you need to bring me $1,400 right now for your van and tell somebody to come get your van.

(GX H-I). The listener also can hear Witness-1 crying out (in Spanish), "He's breaking the windows, please, on my car!" (*Id.*).

On or about April 9, 2022, Gentille again called Witness-1 on the phone and threatened, "If you leave your house, if you go anywhere, I'll hurt you."

When Gentille made that final threat, Witness-1 called 911 again. At this point, Witness-1 believed that she would never be safe and decided that the only way she could protect herself from Gentille was to flee New York. Accordingly, Witness-1 took her dogs and a few suitcases and fled to another state. As of August 23, 2022, Witness-1 was still living outside of New York because Gentille caused her to fear for her life.

### iii.  Specification 6: Failure to Report Arrests to Probation

As the defendant admitted on August 23, 2022, he violated the terms of his supervised release by failing to notify his Probation Officer within 72 hours of being arrested. (Violation Report at 3, Specification 6). Although Gentille notified Probation Officer Kristen Maharaj of his March 2022 arrest relating to his aggravated harassment of the SSS employees, he failed to notify her of his April 2022 arrests relating to his crimes against Witness-1. According to Officer Maharaj, when she confronted Gentille in April 2022, he informed her that he failed to notify her of his April arrests because "he didn't know how to explain the story."

## II.  Applicable Law

The Court may revoke a term of supervised release upon a finding by a preponderance of the evidence that the defendant violated a condition of supervised release. 18 U.S.C. § 3583(e)(3). When imposing a sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, and the applicable Guidelines range. *See* 18 U.S.C. §§ 3553(a); 3583(e)(3).

The goal of a revocation sentence is primarily "to sanction the violator for failing to abide by the conditions of the court-ordered supervision," in order to account for the breach of trust inherent in failing to follow the court-imposed conditions of supervised release. U.S.S.G. Ch. 7, Pt. A(3)(b); *see also United States v. Sindima*, 488 F.3d 81, 86 (2d Cir. 2007).

The defendant was in Criminal History Category V at the time of his original offense. (PSR ¶ 73). Accordingly, the defendant's Guidelines range with respect to Specifications 1-6, all of which are Grade C violations, is 7 to 13 months' imprisonment. *See* U.S.S.G. § 7B1.4. The statutory maximum term of imprisonment for the defendant's violations is two years. *See* 18 U.S.C. § 3583(e)(3).

### III.  Discussion

The Government has conferred with Probation and believes that the defendant's breach of the Court's trust is appropriately sanctioned with a significant term of incarceration.  Probation recommends a sentence of 10 months' imprisonment, which is within the applicable Guidelines range of 7 to 13 months' imprisonment.  However, given the nature of the specifications charged and the defendant's lack of remorse as demonstrated in his sentencing submission, the Government believes that a term of incarceration at the top of the Guidelines range, 13 months' imprisonment, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Gentille's offense conduct is so severe that it caused one of his victims to flee the state, and another to alter her route to work every morning to avoid further threats and harassment.  His behavior was unprovoked, dangerous, and unrelenting.  With regard to Specification 1, he called SSS incessantly and made numerous threats to SSS employees.  Rather than limiting his harassment to threats over the phone, he actually showed up in person at SSS and continued threatening the employees.

The offense conduct underlying Specifications 2-5 occurred only a month later.  Over the course of approximately one week, Gentille stalked, harassed, berated, and threatened his ex-girlfriend.  He stole her cellphone out of her hand and threatened to send nude photographs and videos of her to her family, "starting with [her] mother, from [her] mother down, to [her] little brother. . . ."  (GX A at 1:28-1:41).  He showed up at her apartment and entered without her permission.  He threatened her, over the phone and in person, stating that, if she left her apartment, he would hurt her, and told her that he would bring four or five of his friends with him to cause her harm.  Gentille circled her block in the middle of the night, honking a car horn to cause her fear.  He held her car hostage and broke its windows.

Gentille's behavior was violent and persistent.  He terrorizes his victims and has demonstrated absolutely no remorse for his actions.  Not only was his plea allocution to this Court incredibly sparse, but his two-page handwritten letter to the Court lacks any acknowledgement of, or apology for, his behavior.  Instead, the defendant apologizes for his "present predicament" and emphasizes his fear of "los[ing] what [he] worked so hard to get . . . because [he is] locked away in prison."  (Dkt. No. 238-1).  It is undeniable that the defendant regrets his current incarceration, but entirely unclear whether he recognizes that it is his own behavior that has landed him in jail.  Further, the defendant has offered the Court no reason to believe that, if released, he will cease harassing and threatening intimate partners and members of the public.

Due to the severity of the offense conduct and the defendant's lack of remorse, a significant incarceratory term is necessary to protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(2)(C).  The Government respectfully submits that a sentence at the top of the Guidelines range is appropriate to reflect the seriousness of the violations, to afford adequate specific deterrence to this defendant, and to protect the public from further offenses by the defendant.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a significant sentence of imprisonment and re-impose a term of supervised release with the previously imposed special conditions.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ Amanda Weingarten
Amanda Weingarten
Assistant United States Attorney
(212) 637-2257

cc: Lance Lazzaro (counsel for defendant), by ECF